(108 App. Div. 263.)

FIDELITY & DEPOSIT CO. OF MARYLAND v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. November 10, 1905.)

1. MUNICIPAL CORPORATIONS—PURCHASING LAND FOR COLLEGE—BROKER'S COMMISSIONS—LIABILITY OF MUNICIPALITY.

Laws 1866, p. 560, c. 264, continued in force by Laws 1882, p. 297, c. 410, § 1055, and Laws 1901, p. 484, c. 466, § 1127, organized the College of the City of New York as a distinct body corporate. Laws 1882, p. 297, c. 410, § 1056, provided that the members of the board of education, with the president of the college, should be the trustees thereof, and section 194 (page 50) required the board of estimate to appropriate an annual sum for salaries of professors, etc. Laws 1895, p. 200, c. 168, authorized the trustees to acquire a site for new buildings for the college. Held, that a broker, employed by the trustees in the purchase of the land for a new site, could not sue the city for his commissions.

2. SAME.

The fact that Laws 1895, p. 200, c. 168, provided that on the application of the trustees the comptroller of the city of New York should issue bonds in the name of the mayor, etc., sufficient to pay the expenses incurred in procuring the site, showed that the city could not be sued for the commissions, at least until it had been put in default in failing to issue the bonds.

Appeal from Trial Term.

Action by the Fidelity & Deposit Company of Maryland against the city of New York. From a judgment for plaintiff, defendant appeals. Reversed.

Argued before O'BRIEN, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and CLARKE, JJ.

Charles A. O'Neil, for appellant.
John C. Shaw, for respondent.

CLARKE, J. The plaintiff, as assignee of one Jacob D. Butler, brought this action to recover from the city of New York the sum of $6,000, with interest from August 1, 1899, for services alleged to have been rendered by said Butler under a contract as broker in connection with the purchase of land for the new site of the College of the City of New York. The case was tried by the court, a jury having been waived.

The College of the City of New York is a domestic corporation, organized and existing by virtue of a special act of the Legislature, being chapter 264, p. 560, of the Laws of 1866, recognized and continued by section 1055 of the consolidation act (Laws 1882, p. 297, c. 410), and section 1127 of the charter (Laws 1901, p. 484, c. 466). Each of those acts provides it "shall continue to be a separate and

distinct organization and body corporate." It is a part of the educational system of the city. At the time of the passage of the act of 1895, hereinafter alluded to, the members of the board of education, together with the president of the college, were ex officio the trustees of the said college. Consol. Act, Laws 1882, p. 297, c. 410, § 1056. By section 194 (page 50) the board of estimate was required to appropriate such sum as was required by the trustees in accordance with section 1059 (page 298), not exceeding $150,000 per annum, for the payment of salaries of professors and officers, for obtaining apparatus and books, for repairing and altering the college buildings, and for the support, maintenance, and general expenses of said college; and by chapter 143, p. 180, of the Laws of 1882, it was made the duty of the trustees to furnish gratuitously the benefit of education to all male students residing in the city who should pass the required examination. Chapter 168, p. 200, of the Laws of 1895, passed March 27th, is entitled:

"An act to authorize the procuring of new grounds and the erection thereon of buildings for the use of the College of the City of New York, and to provide the means to pay for the same, and giving authority to its trustees."

Section 1 provides:

"The board of trustees of the College of the City of New York is hereby authorized and empowered to select and acquire, in the name and on behalf of the mayor, aldermen and commonalty of the city of New York, a site for a new building or buildings for the uses and purposes of said college."

Section 2 provides for the filing by said board of a map of the site selected.

Section 3 provides:

"Upon the selection of said site and the filing of such map, the said board of trustees may and they are hereby authorized, in the name and on behalf of the mayor, etc., to enter into contract with the owner or owners of said site for the purchase thereof at a price or prices to be approved by the board of estimate and apportionment of said city as the reasonable value thereof and not exceeding in the aggregate $600,000. If within thirty days after such site shall be selected and such map shall be filed the said board of trustees shall not be able to agree with the owner or owners of such site for the purchase thereof as hereinbefore provided, the said board may and shall, in the name and on behalf of the mayor, etc., proceed to acquire the title to and the ownership of the lands constituting such selected site."

Such proceedings are to be those provided by sections 2–7, c. 191, pp. 252–255, of the Laws of 1888, entitled "An act to provide for the acquisition of sites for school buildings by the board of education."

Section 4 (page 201) provides:

"Upon the execution of the contract or contracts to purchase such site, made with the owner or owners thereof as hereinbefore authorized, or on the final confirmation of the report of the commissioners of estimate appointed in the proceedings to acquire such site, and upon application of the said board of trustees, the comptroller of the city of New York shall issue bonds in the name and on behalf of the mayor, etc., to an amount sufficient to pay the contract price or the damages for compensation for such site, and for the expense incurred in the proceedings to acquire title to the said site, including the fees of the commissioners of estimate and the compensation of their employees and all necessary expenses in and about the proceedings provided for by this act, and all reasonable expenses incurred by the counsel to the corporation in ex-

amining the title to said site, and in said proceedings for and on behalf of the said board of trustees and the said mayor, etc."

Section 5 (page 202) provides:

"On the receipt by the comptroller of the proceeds of the sale of the said bonds and within thirty days after the final confirmation of the report of the said commissioners of estimate, or in case of voluntary purchase, upon delivery of proper deed or deeds, the said comptroller shall pay out of said proceeds the aforesaid contract price, damages, fees and compensation to the respective persons to whom the same may be due."

Acting under said statute, the trustees selected a site and duly filed the map. On July 18, 1895, the board of trustees resolved:

"That a subcommittee, consisting of the chairman, be appointed to arrange with owners of property included within the new site selected for the college, and perfect, if possible, the purchase of the same in compliance with the requirements of the act of the Legislature providing for the new site."

On August 16, 1895, the executive committee resolved:

"That the matter of arranging with Jacob D. Butler as to his fees for securing the site in question by contract or condemnation be referred to the chairman of the executive committee and chairman of the board of trustees, with power."

On the 23d of August the said two chairmen and Butler signed a paper which, after reciting the above resolution, proceeded:

"This agreement witnesseth that the said Butler agrees with the executive committee and the said board of trustees that he will act as the sole representative of the said executive committee and will use his best endeavors to secure for them the property embraced within said site at private sale, and also will act as their representative in condemnation proceedings if the same should become necessary, for the sum of $6,000, to be paid to him at the conclusion of the purchase of the above-mentioned site, whether by private sale or by condemnation. * * * And the said Robert Maclay and Alexander P. Ketcham, on behalf of the said executive committee and said trustees of said college, agree that the said $6,000 shall be paid to the said Butler in accordance with the terms herein set forth."

Butler testified that he procured the sale of all but 4 out of the 126 lots acquired; his work being completed about August 1, 1899. Upon the 4 lots subsequently acquired by condemnation proceedings he had obtained options. No question is raised as to performance upon his part. Butler assigned his claim to the plaintiff. On June 16, 1902, the board of trustees of the college resolved:

"That the claim of the Fidelity & Deposit Company of Maryland, as assignee of Jacob D. Butler, against the city of New York, in connection with the contract made between the board of trustees of the College of the City of New York and the said Jacob D. Butler, dated August 23, 1905, be, and the same is hereby, rejected."

On June 2, 1903, the plaintiff presented its claim and demand in writing to the comptroller, and more than 30 days had expired without action by him thereon when this suit was commenced. Plaintiff had judgment for $6,000, with interest from August 1, 1899, amounting to $1,980, and $117.75 costs, in all $8,097.75.

At the commencement of the trial the defendant moved for the dismissal of the complaint upon the ground that the complaint did not state facts sufficient to constitute a cause of action, and at the close of the trial upon the ground that no facts had been proven sufficient to constitute a cause of action against the defendant, and

duly excepted to the denial of its motion. The motion should have been granted, and this judgment must be reversed. The plaintiff established no cause of action against the city. His contract, if such there were, was with "a separate and distinct organization and body corporate," to wit, the College of the City of New York. The obligation of the city was only—

"Upon application of the said board of trustees   *   *   *   to issue bonds to an amount sufficient to pay the contract price   *   *   *   and for the expense incurred in the proceedings."

Until such application had been made and refused by the comptroller, the city could not be put in default, and no action would lie. The situation is precisely analogous to the relation that the city bears to the board of education. That board is by law created a corporate body. To that board the city is required by law to make appropriations for the pay of teachers and officers, supplies, and maintenance. To that board is given the power to purchase or condemn land for school sites and erect buildings, and the title to all school property so acquired "shall be vested in the mayor, aldermen and commonalty,   *   *   *   but shall be under the care and control of the board of education for the purpose of public instruction." Consol. Act, Laws 1882, p. 291, c. 410, § 1029, in force at that time. The relations of the board of education to the city, and the necessity of suing the board for all contracts with it, instead of the city, has recently been exhaustively considered and settled by the Court of Appeals in Gunnison v. Board of Education, 176 N. Y. 11, 68 N. E. 106, where the precise point was raised by demurrer that plaintiff, suing for wages as a teacher, should have sued the city, and not the board. The court unanimously held the demurrer bad. Judge O'Brien used this language:

"A brief review of some of the cases in this and other courts will show that there never was and cannot now be any doubt with respect to the liability of the board of education of the city of New York to be sued upon any disputed claim or liability arising out of the exercise of its corporate functions as the sole representative of the school system of the city."

The most careful examination and analysis of the provisions of law relating to these two corporations leads to the conclusion that the relation of the board of education and the city to the public schools is the same as that of the city college and the city to the higher education of the city's pupils. Therefore the same rule must be followed.

There is this further consideration: The cost of this land and the payment of the expenses incident thereto were not to come out of the general current revenues of the city, but were to be raised in a specific way, to wit, by the issue and sale of bonds upon the application of the trustees of the college. Where a particular mode of discharging the obligations of municipal corporations is provided by law, that mode must be pursued; and it is only when the corporation is put in default in omitting to discharge some duty imposed upon it by statute, after the proper steps have been taken, that an action will lie. Swift v. Mayor, 83 N. Y., at page 535; Dannat v. Mayor, 66 N. Y. 588. Here not only does it not appear that any

application was made to the comptroller by the trustees for the payment of this claim, but it affirmatively appears that the trustees had rejected the claim. Under such a state of facts, the city cannot be held in default.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide the event. All concur.

